# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| EDWARD WIECZOREK, | ) |
| Plaintiff, | ) |
| v. | ) No. 13 C 4017 |
| CAROLYN W. COLVIN, Acting Commissioner of Social Security, | ) Magistrate Judge Finnegan |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Edward Wieczorek seeks to overturn the final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying his application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act. 42 U.S.C. §§ 416(i), 423(d). The parties consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and filed cross-motions for summary judgment. After careful review of the record, the Court now grants the Commissioner's motion, denies Plaintiff's motion, and affirms the decision to deny disability benefits.

## PROCEDURAL HISTORY

Plaintiff applied for DIB on July 19, 2010, alleging that he became disabled on May 24, 2004 due to Dupuytren's contractures (a hand impairment), hypothyroidism and anxiety. (R. 152, 212). The Social Security Administration denied the applications initially on October 13, 2010, and again upon reconsideration on March 4, 2011. (R. 85-91, 97-102). Plaintiff filed a timely request for hearing and appeared before Administrative Law Judge Joel G. Fina (the "ALJ") on April 5, 2012. (R. 36). The ALJ

heard testimony from Plaintiff, who was represented by counsel, as well as from medical expert Laura M. Rosch, D.O. (the "ME") and vocational expert Thomas Allen Gusloff (the "VE"). Shortly thereafter, on May 30, 2012, the ALJ found that Plaintiff is not disabled because there were a significant number of medium jobs he could have performed prior to his December 31, 2010 date last insured ("DLI"). (R. 9-17). The Appeals Council denied Plaintiff's request for review on March 27, 2013, (R. 1-3), and Plaintiff now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner.

In support of his request for remand, Plaintiff argues that the ALJ made a flawed residual functional capacity ("RFC") determination, resulting in an incomplete hypothetical question to the vocational expert. As discussed below, the Court finds that the ALJ's decision is supported by substantial evidence and does not require reversal or remand.

## **FACTUAL BACKGROUND**[1]

Plaintiff was born on March 20, 1955, and was 55 years old on the December 31, 2010 DLI. (R. 152, 208). He has a high school diploma and spent 28 years working as a packer for automotive and scientific supply companies. He stopped working in May 2004 for reasons not clear from the record, had surgery on his right hand in August 2005, and tried to resume packing work in early 2006. The warehouse closed after Plaintiff had been there less than six months, and he has not held another job since that time due to continuing problems with his hands. (R. 40-41, 44-45, 72-73, 212-13, 244, 322).

---

[1] Consistent with Plaintiff's arguments for remand, this opinion focuses primarily on his hand impairment and related physical issues.

2

**A.    Medical History**

The first available medical record relating to Plaintiff's hands is an August 10, 2005 x-ray of his right pinky finger. (R. 327). The test showed soft tissue swelling of the "right fifth digit," and a "subchondral cyst involving the distal aspect of the proximal phalanx of the third digit." (*Id.*). Approximately two weeks later, on August 23, 2005, Plaintiff had a right hand partial palmar fasciectomy due to Dupuytren's contracture of the right palm.[2] (R. 322). Thereafter, from 2007 through May 2010, Plaintiff had regular appointments with his internist, Sameer M. Naseeruddin, M.D., at Fahey Medical Centers, but none of the treatment notes mentions hand pain or difficulties. (R. 292-93, 379-80, 381-91, 428, 445-46).

**1.    June through December 2010**

On June 2, 2010, Plaintiff saw Sanjay K. Patari, M.D., of the Center for Sports Orthopaedics, S.C., due to a recurrence of Dupuytren's contracture in both of his pinky fingers, "right greater than left." (R. 340). Dr. Patari recommended that Plaintiff try Xiaflex to treat the condition, but it is not clear from the record whether he ever started that medication. (*Id.*). The following month, on July 19, 2010, Plaintiff applied for disability benefits.

On September 14, 2010, Roopa K. Karri, M.D., performed an Internal Medicine Consultative Examination of Plaintiff for the Bureau of Disability Determination Services

---

[2]    "Dupuytren's contracture" is "a hand deformity that usually develops slowly, over years," and "affects a layer of tissue that lies under the skin of your palm. Knots of tissue form under the skin – eventually forming a thick cord that can pull one or more of your fingers into a bent position. Once this occurs, the fingers affected by Dupuytren's contracture can't be straightened completely, which can complicate everyday activities such as placing your hands in your pockets, putting on gloves or shaking hands." (www.mayoclinic.org/diseases-conditions/dupuytrens-contracture/basics/definition/con-20024378, last viewed on July 31, 2014).

("DDS"). (R. 348-51). Plaintiff told Dr. Karri that his right hand "did not get better" following the surgery in 2005, and he has difficulty driving and dressing because his pinky fingers "poke[] through everything he has to hold." (R. 349). Though he can write "some," he can only wear mittens and not gloves, and he cannot hold a ball or play ball with his grandchild. Plaintiff described driving with the palms of his hands due to difficulty grasping, and said he has trouble holding a coffee pot, getting things in his pockets, washing his face, and picking up boxes. (*Id.*). He reported taking naproxen (brand name Naprosyn) at that time for pain. (*Id.*).

Dr. Karri's physical examination confirmed the presence of Dupuytren's contractures with flexed pinky fingers and "mild flexion of the right second finger." (R. 350). Plaintiff exhibited slightly reduced grip strength of 4/5 in both hands, as well as mild difficulty squeezing the blood pressure pump, buttoning, zipping, and tying shoelaces, but Plaintiff said "the fifth fingers are an annoyance, more than anything." Dr. Karri observed that Plaintiff was able to get on and off the exam table and walk 50 feet without support, and she noted normal range of motion in Plaintiff's shoulders, elbows, wrists, hips, knees, ankles, cervical spine, and lumbar spine, with full strength of 5/5 in the arms and legs, and normal sensation. (*Id.*). Dr. Karri diagnosed "History of Dupuytren's contractures in both hands with flexed fifth fingers." (R. 351).

A few weeks later, on October 8, 2010, David Mack, M.D., completed a Physical Residual Functional Capacity Assessment of Plaintiff for DDS. (R. 367-74). Based on the 2005 surgical report, Dr. Patari's June 2010 treatment note, and Dr. Karri's consultative exam, Dr. Mack found that Plaintiff's Dupuytren's contracture allows him to occasionally lift 50 pounds; frequently lift 25 pounds; stand, walk and sit for about 6

hours in an 8-hour workday; and push and pull without limitation. (R. 368, 374). He can never climb ladders, ropes or scaffolds; he can frequently handle (gross manipulation); he can frequently finger (fine manipulation); and he can reach and feel without limitation; but he must avoid concentrated exposure to hazards such as machinery and heights. (R. 369-71). Dr. Mack concluded that Plaintiff's statements regarding his limitations were "partially credible," noting that despite having reduced grip strength, he told Dr. Karri that his flexed pinky fingers are "an annoyance, more than anything." (R. 372).

Approximately one month before the DLI of December 31, 2010, Plaintiff returned to his internist, Dr. Naseeruddin, on November 4, 2010 requesting that the doctor "fill out papers" in support of his disability claim. (R. 378). As noted previously, Plaintiff had last seen the doctor in May 2010. In his November treatment note, Dr. Naseeruddin mentioned Dupuytren's contracture for the first time, and described Plaintiff's pinky fingers as contracted, with additional contracture of the 1st and 4th fingers. (R. 377). In a Physical Residual Functional Capacity Questionnaire completed the same day, Dr. Naseeruddin reiterated that Plaintiff suffers from Dupuytren's contracture, and claimed for the first time that he also has degenerative joint disease ("DJD") and osteoarthritis which cause him pain, numbness, locking, and difficulties grasping objects. (R. 403). According to Dr. Naseeruddin, these symptoms would constantly interfere with Plaintiff's ability to maintain the attention and concentration needed to perform even simple work tasks.

Considering the demands of a typical 8-hour workday, Dr. Naseeruddin said that Plaintiff can sit and stand for 45 minutes at one time, but he can only sit for less than 2

hours and stand/walk for about 2 hours total. In addition, he must walk for 8-10 minutes every hour, and he needs to take 3-4 unscheduled breaks each day. These must be followed by 1-2 days of rest before he can return to work due to severe hand pain and adverse effects of medication. (R. 403-04). Dr. Naseeruddin stated that Plaintiff can occasionally lift less than 10 pounds, never lift 10 or more pounds, and never use his hands or fingers at all. (R. 404). He will be absent from work more than 4 days per month, and cannot grasp objects in either hand due to the Dupuytren's contractures and "extreme osteoarthritis/DJD." (R. 405).

### 2. 2011

At a follow-up appointment with Dr. Naseeruddin on February 10, 2011, Plaintiff complained of hand pain and an inability to work. (R. 450). An examination showed contracture of the 5th fingers of both hands, contracture of the 2nd finger on the right hand, and mild contracture of the 2nd finger on the left hand, and Plaintiff was unable to open either hand and lay it flat. (*Id.*). Dr. Naseeruddin diagnosed Dupuytren's contracture and DJD/osteoarthritis, and stated that Plaintiff is unable to work, has limited mobility, and suffers from "contracture/pain." The doctor also noted that the options for treatment are limited. (R. 449).

Plaintiff returned to Dr. Naseeruddin for a check-up on May 10, 2011. He continued to present with bilateral Dupuytren's contractures "affecting primarily the first and fifth fingers on the right hand and the fifth finger of the left hand," but exhibited "good flexion and extension at the wrist." Though Plaintiff had "nodules on the proximal and Inter-phalangeal joints," he was "otherwise feeling well." (R. 426). Dr. Naseeruddin

diagnosed Dupuytren's contractures and instructed Plaintiff to return in six months. (*Id.*).

### 3. 2012

Nearly a year later on April 6, 2012 (one day after the administrative hearing before the ALJ), Dr. Naseeruddin wrote a letter addressed "To Whom it may concern" stating that Plaintiff has "bilateral hand contractures which cause pain, significantly reduced range of movement and significant functional disability." (R. 465). Dr. Naseeruddin indicated that Plaintiff has been "unable to work for several years due to these problems," and expressed his belief that the "hands are a major cause of disability in this patient." (*Id.*). The last available treatment note is from April 26, 2012, when Plaintiff saw Dr. Naseeruddin for a "well man exam." (R. 473). He still had bilateral contractures of the hands, but no deformities, clubbing, cyanosis or edema in any extremities. (*Id.*).

### B. Plaintiff's Testimony

On August 5, 2010, Plaintiff completed a Function Report in connection with his application for disability benefits. (R. 232-39). He stated that he cannot shake hands or put on gloves, and he has trouble gripping items and placing his hands in his pockets. (R. 232). In addition, his little fingers poke him in the eyes when he bathes, and hand pain affects his sleep. (R. 233). Plaintiff reported that he can make sandwiches and also do some cleaning, laundry, and yard work, though he needs help gripping the laundry handles. (R. 234). In a Physical Impairments Questionnaire completed the same day, Plaintiff stated that he has trouble gripping kitchen tools, opening jars, and carrying things (e.g., groceries, laundry and trash), but reported no problems turning the

7

pages of a book or newspaper, dialing a phone, picking up a coin, using a pen or pencil, or reaching overhead. (R. 241). Plaintiff also indicated that he has no trouble standing and moving about, except that he gets tired doing laundry and taking stairs. (R. 242).

In a second Function Report completed on January 27, 2011, Plaintiff reported that his hand condition causes pain, stiffness and numbness that wakes him up 3-4 times a night. (R. 264-65). He has trouble with many personal care activities in addition to bathing, and needs help with laundry, mowing and snow shoveling. (R. 265-66). Compared with the August 2010 report, Plaintiff now complained of difficulty walking, sitting, kneeling, lifting, standing, reaching and completing tasks, and said he mostly uses his phone's speaker function so he does not have to hold the receiver. (R. 268-69). A second Physical Impairments Questionnaire completed the same day likewise reflected increased pain, stiffness and weakness in the hands, with similar complaints relating to the arms, knees and legs. (R. 273-74).

At the April 5, 2012 hearing before the ALJ, Plaintiff testified that he can hold a pen for 10 or 15 seconds before his fingers start to lock up, and it takes him 30 to 45 minutes to eat dinner due to difficulties holding a fork and knife. (R. 43). He tries not to lift anything because of the pain and stress it places on his hands, he has growths on the nerves in his hands that cause pain "right up my wrist, into my forearms," and he cannot drive much or cook because of spasms and loss of grip strength. (R. 46-49).

C. **Medical Expert's Testimony**

Dr. Rosch testified at the hearing as an ME. She stated that she could not "fully adopt" Dr. Naseeruddin's November 2010 opinion because there was no objective medical evidence to support many of the imposed limitations, including inability to grasp

anything at all, a need to miss more than 4 days of work each month, and difficulties standing and walking. (R. 55). The ME found it significant that Dr. Naseeruddin never referred Plaintiff for physical or occupational therapy, or sent him to a pain specialist despite allegations of chronic pain. (*Id.*). In the ME's view, given the importance of hand use in everyday life, a doctor would not reasonably tell a patient with no ability to use his hands whatsoever that "I'm not going to refer you, I'm not going to treat you." (R. 61). In addition, Plaintiff exhibited no atrophy of the wrists or forearms, conditions that generally develop from significant loss of hand function and associated disuse. (R. 58-59, 63). As the ME explained, "if you aren't using the hands, you're not going to be using these muscles in the forearm, and there's going to be loss of strength and some atrophy and some deconditioning associated with that." (R. 70). Plaintiff, however, has grip strength of 4/5, and full motor strength of 5/5 in all extremities. (R. 69-70).

Though the ME acknowledged that Plaintiff's current description of his condition was more severe, she concluded that based on the medical evidence, he retained the RFC for medium work as stated by Dr. Mack (in the physical RFC assessment) up through the December 31, 2010 DLI. Specifically, he could occasionally lift up to 50 pounds; frequently lift up to 25 pounds; sit, stand and walk for at least 6 hours in an 8-hour workday; frequently perform both fine and gross manipulations with both hands; never climb ladders, ropes or scaffolds; and never be around unprotected heights or machinery. (R. 56-57).

**D.    Vocational Expert's Testimony**

Mr. Gusloff testified at the hearing as a VE. He said that a person with an RFC as set forth by the ME and Dr. Mack would be capable of performing Plaintiff's past

9

work as a picker/packer, which is unskilled and medium as customarily performed. (R. 73-74). If the person could only occasionally (instead of frequently) perform fine manipulations, he would not be able to work as a picker/packer, but he could still perform other jobs available in the regional and national economy, including counter supply worker (3,000 jobs available in Chicago, 150,000 nationally), patient transporter (1,500 jobs available in Chicago, 50,000 nationally), and general helper (3,000 jobs available in Chicago, 150,000 nationally). (R. 75).

**E.   Administrative Law Judge's Decision**

The ALJ found that Plaintiff's bilateral Dupuytren's contracture with a 2005 partial right palmar fasciotomy is a severe impairment, but that it did not meet or equal any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1, up through the December 31, 2010 DLI. (R. 11-12). After reviewing the medical evidence in detail, the ALJ determined that as of the DLI, Plaintiff had the capacity to perform medium work, except that he could never climb ladders, ropes or scaffolds; he could frequently handle objects, which is defined as gross manipulation; he could occasionally finger objects, which is defined as fine manipulation; and he needed to avoid concentrated exposure to moving machinery and unprotected heights. (R. 13).

In reaching this conclusion, the ALJ noted that the stated RFC is consistent with the opinions from both the ME and Dr. Mack, and explained that the ME's opinion was entitled to "considerable weight" because she "is a board certified internist, who is familiar with Social Security policy and Regulations, she reviewed the complete documentary record, and she provided a detailed explanation with references to the evidence in the record to support her opinion." (R. 14-15). The ALJ rejected the

10

November 2010 opinion from Dr. Naseeruddin given the ME's testimony that his "progress notes do not reflect the objective findings or clinical observations that would support" the extreme limitations he identified. (R. 14). In that regard, the doctor's "progress notes do not reflect significant pain complaints, and the only treatment for pain is Naprosyn" with no need for stronger medications or referral to a pain clinic. (*Id.*). Moreover, Dr. Karri's September 2009 exam showed that Plaintiff had good function, including full motor strength, normal reflexes, normal sensation, and full range of motion in all joints except the hands. (R. 15). Finally, the ALJ noted the ME's testimony that "one would expect to see more aggressive medical management, such as physical and occupational therapy, in an individual who had the types of extreme hand limitations outlined by Dr. Naseeruddin." (*Id.*).

Based on the stated RFC, the ALJ accepted the VE's testimony that up through the DLI, Plaintiff could not perform any of his past relevant work, but remained capable of performing a significant number of unskilled medium jobs available in the regional and national economy, including counter supply worker, patient transporter, and general helper. (R. 15-16). The ALJ thus concluded that Plaintiff was not disabled within the meaning of the Social Security Act at any time prior to his DLI, and is not entitled to benefits.

## **DISCUSSION**

### A.    **Standard of Review**

Judicial review of the Commissioner's final decision is authorized by § 405(g) of the Social Security Act. *See* 42 U.S.C. § 405(g). In reviewing this decision, the Court may not engage in its own analysis of whether Plaintiff is severely impaired as defined

by the Social Security Regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004) (citation omitted). Nor may it "displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations." *Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010) (quoting *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007)). The court's task is to determine whether the ALJ's decision is supported by substantial evidence, which is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011) (quoting *Skinner*, 478 F.3d at 841).

In making this determination, the court must "look to whether the ALJ built an 'accurate and logical bridge' from the evidence to [his] conclusion that the claimant is not disabled." *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009) (quoting *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008)). Where the Commissioner's decision "'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required." *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009) (quoting *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002)).

**B. Five-Step Inquiry**

To recover DIB under Title II of the Social Security Act, a claimant must establish that he is disabled within the meaning of the Act. *Crawford v. Astrue*, 633 F. Supp. 2d 618, 630 (N.D. Ill. 2009). A person is disabled if he is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Crawford*, 633 F. Supp. 2d at 630; *Strocchia v. Astrue*, No. 08 C 2017,

2009 WL 2992549, at *14 (N.D. Ill. Sept. 16, 2009). In determining whether a claimant suffers from a disability, the ALJ conducts a standard five-step inquiry: (1) Is the claimant presently unemployed? (2) Is the claimant's impairment severe? (3) Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations? (4) Is the claimant unable to perform his former occupation? and (5) Is the claimant unable to perform any other work? *See* 20 C.F.R. § 404.1520; *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000).

**C.    Analysis**

Plaintiff claims that the ALJ's decision must be reversed because he made a flawed RFC determination, resulting in an incomplete hypothetical question to the VE. A claimant's RFC is the maximum work that he can perform despite any limitations. 20 C.F.R. § 404.1545(a)(1); SSR 96-8p. "When determining the RFC, the ALJ must consider all medically determinable impairments, . . . even those that are not considered 'severe.'" *Craft*, 539 F.3d at 676. "[T]he responsibility for the RFC assessment belongs to the ALJ, not a physician, [but] an ALJ cannot construct his own RFC finding without a proper medical ground and must explain how he has reached his conclusions." *Amey v. Astrue*, No. 09 C 2712, 2012 WL 366522, at *13 (N.D. Ill. Feb. 2, 2012). *See also* 20 C.F.R. §§ 404.1527(e)(2), 416.927(e)(2).

The ALJ found that up through the December 31, 2010 DLI, Plaintiff was capable of medium work (occasionally lifting up to 50 pounds; frequently lifting up to 25 pounds; and sitting, standing and walking for at least 6 hours in an 8-hour workday), with frequent handling; occasional fingering; no climbing of ladders, ropes or scaffolds; and no work around unprotected heights or moving machinery. (R. 13). This is consistent

with both the ME's testimony, which the ALJ assigned "considerable weight," and the RFC from Dr. Mack. (R. 14, 15). The only contrary opinion in the record is Dr. Naseeruddin's November 2010 RFC assessment that Plaintiff could not use his hands at all and had significant limitations in his ability to sit, stand, walk, lift, and concentrate. (R. 403-04). Plaintiff does not invoke the so-called treating physician rule or develop any factual or legal argument challenging the weight the ALJ assigned to the opinions of record. In fact, he does not mention the ME's testimony at all even though the ALJ relied heavily on her opinion. Instead, Plaintiff claims generally that the stated RFC is "far beyond [w]hat [he] would be able to do," and that Dr. Naseeruddin's opinion "reveals the severity of his impairment" as viewed by "his long-treating physician." (Doc. 16, at 6, 7).

A treating source opinion is entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. 20 C.F.R. § 404.1527(c)(2); *see Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011); *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010). An ALJ must offer "good reasons" for discounting a treating physician's opinion, *Scott*, 647 F.3d at 739, and then determine what weight to give it considering (1) the length of the treatment relationship and frequency of examination, (2) the nature and extent of the treatment relationship, (3) the degree to which the opinion is supported by medical signs and laboratory findings, (4) the consistency of the opinion with the record as a whole, and (5) whether the opinion was from a specialist, and (6) other factors brought to the attention of the ALJ. 20 C.F.R. § 404.1527(c)(2)-(6). *See, e.g.*, *Simila*, 573 F.3d at 515.

Here, the ALJ discussed Dr. Naseeruddin's opinion in detail, but accepted the ME's testimony that the restrictions he identified are not supported by objective medical evidence. (R. 14). For example, despite Plaintiff's testimony that he suffers from severe hand pain, no such complaints appear in Dr. Naseeruddin's progress notes, and he never prescribed Plaintiff anything besides Naprosyn, a non-steroidal anti-inflammatory drug. (*Id.*). In addition, there is no evidence that Dr. Naseeruddin ever referred Plaintiff to a pain clinic or recommended that he have physical or occupational therapy. This is significant because according to the ME, hand use is so important in everyday life that she would expect to see these "more aggressive medical management" treatments for an individual with the "types of extreme hand limitations outlined by Dr. Naseeruddin." (R. 14-15, 61). In a similar vein, the ME testified that such a severely limited individual would also exhibit signs of atrophy of the wrists or forearms due to lack of hand use and associated deconditioning, but there was no evidence of those conditions in the record. (R. 14, 54, 70).

Plaintiff says nothing about these findings but suggests that Dr. Naseeruddin's opinion is nevertheless supported by Dr. Karri's September 2010 assessment that he "experiences difficulty using his hands, very limited writing, and difficulty grasping." (Doc. 16, at 6). In Plaintiff's view "[e]ven the Social Security Administration's medical reviewer [Dr. Mack]" confirmed that he has such limitations. (*Id.*). The problem with this argument is that the language Plaintiff cites actually reflects his own subjective complaints about his symptoms. (R. 349 (report to Dr. Karri under History of Present Illness), 372 (finding Plaintiff's described symptoms partially credible).

15

As the ALJ noted, Dr. Karri's objective examination showed that Plaintiff had nearly full grip strength of 4/5, and only "mild difficulty" squeezing the blood pressure pump, buttoning, zipping, and tying shoelaces. Based on Dr. Karri's assessment, Dr. Mack found – and the ME agreed – that Plaintiff can perform medium work with frequent handling and fingering. Plaintiff is correct that Dr. Mack checked boxes indicating that he has some limitations in his ability to perform fine and gross manipulation, (Doc. 16, at 6 (citing R. 370)), but the doctor also clarified that this meant Plaintiff could do those activities frequently as opposed to constantly. (R. 14, 15). Notably, the ALJ gave Plaintiff the benefit of the doubt and allowed for only occasional fingering even though Plaintiff told Dr. Karri that the contracture of his pinky fingers was "an annoyance, more than anything." (R. 12, 13, 350). The Court sees nothing wrong with this analysis.

With respect to Plaintiff's purported limitations in sitting, standing, walking, and lifting, the ALJ stressed that the "clinical observations" actually revealed "good function" in those areas. (R. 15). Dr. Naseeruddin identified no musculoskeletal problems during a September 2008 Adult Complete Physical, (R. 389), and in September 2010, Dr. Karri found Plaintiff to have full motor strength, normal reflexes, normal sensation, and full range of motion in all of his joints (shoulders, elbows, wrists, hips, knees, ankles, and cervical and lumbar spine). (R. 12, 15, 350). Notably, Dr. Naseeruddin never mentioned any postural limitations prior to the November 2010 RFC Questionnaire, which he completed to help with Plaintiff's application for benefits. That is also the first time the doctor suggested that Plaintiff has degenerative joint disease and osteoarthritis, though he cited no medical tests confirming either of those diagnoses. As the ALJ remarked, "[t]here are no x-rays of [Plaintiff's] hands showing bony erosions

thereby confirming the allegation of arthritis." (R. 14). *See Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007) ("[t]he patient's regular physician may want to do a favor for a friend and client, and so the treating physician may too quickly find disability.") (internal quotations omitted).

In addition to discussing all of this medical evidence, the ALJ further observed that at least up through the DLI, Plaintiff's activities of daily living reflected much greater functioning than Dr. Naseeruddin reported. (R. 14). Though Dr. Naseeruddin opined in November 2010 that Plaintiff could not use his hands at all and had severe limitations in his ability to concentrate, sit, stand, walk, and lift, Plaintiff completed a Function Report just three months earlier in August 2010 stating that he could drive; make sandwiches; do at least some cleaning, laundry and yard work; and had no problem turning the pages of a book or newspaper, dialing a phone, picking up a coin, using a pen or pencil, reaching overhead, standing, sitting, walking, bending, squatting, kneeling, climbing stairs, or concentrating. (R. 14, 235, 237, 241). Plaintiff complained of greater pain and restriction in a second Function Report dated January 27, 2011, but he still did some laundry, mowing, snow shoveling and driving. (R. 13, 14, 266, 267). On this record, and in the absence of any arguments from Plaintiff regarding his activities of daily living or his own testimony, the ALJ did not err in discounting Dr. Naseeruddin's November 2010 functional assessment.[3]

---

[3] Plaintiff does not argue that the ALJ's credibility assessment is improper, or provide any factual or legal analysis in that regard. Any objection to that aspect of the ALJ's decision is therefore waived. *Reynolds v. Astrue*, No. 10 C 1966, 2011 WL 3584474, at *12 (N.D. Ill. Aug. 15, 2011) (quoting *United States v. Holm*, 326 F.3d 872, 877 (7th Cir. 2003)) ("It is well settled that 'perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived.'").

The only other evidence Plaintiff cites is Dr. Naseeruddin's April 6, 2012 letter, written the day after the administrative hearing, which states that Plaintiff "has been unable to work for several years" due to significant hand problems, and that "his hands are a major cause of disability in this patient." (R. 465). Plaintiff acknowledges that "the opinion regarding disability is reserved to the Commissioner," (Doc. 16, at 7), but stresses other findings in the letter such as: "significantly reduced range of movement and significant functional disability"; "a history of being unable to grip things and dropping heavy objects as a result of this"; and "bilateral contracted 5th fingers, with hyperextension of the 2nd-4th fingers." (R. 465).

Conspicuously missing from Plaintiff's briefs is any mention of, or challenge to the ALJ's rationale for discounting the letter, namely, it "does not contain a function by function analysis particularly of manipulative abilities, and the opinion is vague and imprecise." (R. 15). Nor does Plaintiff explain how a general letter written in April 2012, nearly a year after his last exam in May 2011, demonstrates that he was disabled five months before that in December 2010. As discussed above, neither the doctor's treatment notes nor any other objective medical or testimonial evidence supports the existence of restrictions beyond those set forth in the ALJ's RFC. *See Schmidt*, 496 F.3d at 842. Even Dr. Naseeruddin's April 26, 2012 "well man exam" reported no musculoskeletal concerns besides Dupuytren's contractures of both hands, with no deformities, clubbing, cyanosis or edema of the extremities. (R. 472-73). It is possible that Plaintiff's hand and other functioning deteriorated sometime in 2011 or 2012, but "the worsening of a claimant's condition after the date last insured is not a basis for granting benefits." *Pierce v. Astrue*, 907 F. Supp. 2d 941, 952 (N.D. Ill. 2012).

Viewing the record as a whole, the Court finds that the ALJ's RFC determination is supported by substantial evidence. The ME and Dr. Mack both agreed that as of the DLI, Plaintiff was capable of performing medium work with frequent handling and at least occasional fingering, and the ALJ reasonably rejected Dr. Naseeruddin's contrary opinion. Plaintiff points to no other evidence that arguably supports a more restrictive RFC. As a result, his argument regarding the doctrine of "harmless error" has no application here. *See Scott v. Astrue*, 730 F. Supp. 2d 918, 935 (C.D. Ill. 2010) ("Harmless errors are those that do not affect the ALJ's determination that a claimant is not entitled to benefits.").[4]

The Court may also quickly dispose of Plaintiff's argument that the hypothetical question posed to the VE was flawed. (Doc. 16, at 8-9; Doc. 26, at 5). The ALJ asked the VE to consider a person of Plaintiff's age, education, work experience and skill set who could occasionally lift and carry up to 50 pounds; frequently lift and carry up to 25 pounds; sit, stand and walk for 6 hours in an 8-hour workday; frequently handle objects; occasionally finger objects; never climb ladders, ropes or scaffolds; and never be around moving machinery or unprotected heights. (R. 74). This RFC was supported by

---

[4] Plaintiff's theory is that if he were capable of only light as opposed to medium work, the Medical-Vocational Guidelines would mandate a finding of disabled given his age (55 as of the DLI), high school education, unskilled work background, and inability to perform his past relevant work. (Doc. 16, at 8; Doc. 26, at 4-5) (citing 20 C.F.R. Pt. 404, Subpt. P, Appendix 2, Rule 202.04). A flawed RFC finding, he says, therefore would not constitute a harmless error. *See Schomas v. Colvin*, 732 F.3d 702, 707 (7th Cir. 2013) (pursuant to harmless-error review, "we will not remand a case to the ALJ for further explanation if we can predict with great confidence that the result on remand would be the same."). Plaintiff also cites to and quotes from 20 C.F.R. § 404.1567 and SSR 83-10, both of which address the physical exertion requirements for different levels of work. To the extent Plaintiff intended these references to provide support for an argument not relating to the harmless error doctrine, the argument is wholly undeveloped and therefore waived. *Reynolds*, 2011 WL 3584474, at *12; (Doc. 16, at 7; Doc. 26, at 3-4).

the record evidence and fairly considered all of Plaintiff's medically determinable impairments and limitations. *Cf. Steele*, 290 F.3d at 942 (hypothetical question was flawed where it failed to incorporate the plaintiff's depression or impose any related limitations). Plaintiff does not articulate what additional limitations the ALJ should have included in the hypothetical question, or cite to any supporting evidence in that regard. *See Simila*, 573 F.3d at 521 ("[T]he ALJ is required only to incorporate into his hypotheticals those impairments and limitations that he accepts as credible."). The Court thus finds nothing improper about the ALJ's reliance on the VE's testimony that there were a significant number of medium jobs Plaintiff could have performed up through the DLI.

## **CONCLUSION**

For the reasons stated above, Plaintiff's Motion for Summary Judgment (Doc. 15) is denied, and Defendant's Motion for Summary Judgment (Doc. 20) is granted. The Clerk is directed to enter judgment in favor of Defendant.

ENTER:

Dated: July 31, 2014

_____
SHEILA FINNEGAN
United States Magistrate Judge